Russell MADDOX, dba R & R Dog Boarding, Appellant/Cross–Appellee,

v.

Penny HARDY and Dorene Lorenz, Appellees/Cross–Appellants.

Nos. S–12246, S–12243.

Supreme Court of Alaska.

July 11, 2008.

Peter R. Ehrhardt, Kenai, for Appellant/Cross–Appellee.

Robert C. Erwin, Robert C. Erwin, LLC, Anchorage, for Appellee/Cross–Appellant Penny Hardy.

Douglas J. Serdahely, David J. Mayberry, Patton Boggs LLP, Anchorage, for Appellee/Cross–Appellant Dorene Lorenz.

Before: FABE, Chief Justice,
MATTHEWS, EASTAUGH, and
CARPENETI, Justices.

*OPINION*

MATTHEWS, Justice.

## I. INTRODUCTION

This appeal involves a controversy surrounding a large fire started by Dorene Lorenz and other persons for the purpose of clearing rubbish. Russell Maddox, a next-door neighbor, sued Lorenz and other parties he thought were involved for damages the fire caused to his home-based business and property. Lorenz counterclaimed, primarily stating claims based on Maddox's behavior toward her after the fire. The superior court dismissed Lorenz's counterclaims and all of Maddox's claims except his nuisance action. At trial, the jury found in favor of Maddox and awarded him compensatory and punitive damages.

Maddox appeals the superior court's refusal to impose joint and several liability on the alleged owner of the property where the fire took place. We affirm because this person did not own the property during the relevant time period. Lorenz appeals the jury's findings and its award of damages. She also appeals the dismissal of her counterclaims. We affirm the jury's verdict, but reverse the dismissal of most of her counterclaims.

## II. FACTS

Russell Maddox owns a home in Seward. In 2000 he began a home-based dog boarding business called R & R Dog Boarding. According to Maddox, by late 2001 business was strong and his kennels were full.

On November 24 and 25, 2001, Dorene Lorenz decided to clear debris from a piece of property neighboring Maddox's land. The ownership of this property at the time of the fire is contested in this appeal.[1] Wilbur

---

1. Maddox contends that Ethel "Penny" Hardy was the owner. Hardy responds that she sold the lot to Dorene Lorenz before the fire, executing a bill of sale on August 8, 2001. Maddox

"J.R." Thomas Jr., a family friend of Lorenz, drove his excavator to the property. Using the excavator, he began pulling and crushing debris, piling it in a common area about fifty feet away from Maddox's fence.[2] While the parties dispute the pile's exact contents, it likely included, among other things, a Quonset hut, a trailer, a storage shed, a school bus, old cars, furniture, and wood.

Concerned by this activity, Maddox came over to the property and asked Lorenz what was happening. Lorenz told him that she was cleaning up the property and, according to Maddox, "made fun of" him for his concern. Maddox testified that, as he was leaving the property, he smelled gasoline and the pile burst into flame. Thomas added more refuse to the pile as the fire burned. The wind was in the direction of Maddox's property.

The parties dispute the ferocity and size of the fire, although there is general agreement that it was large. Maddox testified that flames came over his fence. He further testified that embers landed on his property and that occasional small explosions threw pieces of metal onto his property. Maddox spent much of the evening stomping out embers that fell on the straw he used for his dogs. The November 24th fire lasted into the night. The following day, Thomas returned and continued his work cleaning the property, burning debris in a second location.

After the fires, Maddox's property was covered with ash. Maddox contacted the Alaska Department of Environmental Conservation (ADEC) and complained about the fire. The ADEC told Maddox to take samples of the ash on his property and have them sent for testing. Maddox did so, paying for the testing with his funds. The testing revealed elevated levels of lead. After

these results, the ADEC and the Alaska Department of Health and Social Services became involved, as did the federal Environmental Protection Agency (EPA). The agencies conducted their own testing—the parties dispute the interpretation of the results—and recommended cleanup procedures.

In light of the testing results, Maddox closed his dog boarding business and began efforts to clean his property. Maddox reopened his business two years later, in January 2004. Maddox explained the delay by stating that the ADEC and EPA told him to leave his property alone so they could assess the contamination and clean the property. After two years, Maddox tired of waiting for agency action and reopened.

### III. PROCEEDINGS

Maddox, represented by counsel, filed a complaint in March 2003 against Dorene Lorenz, Wilbur "J.R." Thomas, Ethel "Penny" Hardy, and others he believed were involved in the fire.[3] Hardy was sued as a possible owner of the property. Maddox asserted claims of nuisance, offensive contact, negligence, negligence per se, and strict liability and asked for compensatory and punitive damages. Lorenz's pro se answer,[4] after amendments, included a number of compulsory and permissive counterclaims: defamation, intentional infliction of emotional distress, battery, and two counts of nuisance (one for Maddox's dog boarding business, the other for an alleged marijuana business).

Maddox moved to dismiss Lorenz's counterclaims in May 2004. In June Superior Court Judge Harold M. Brown issued a notice of intent to dismiss counterclaims for failure to state a claim on which relief may be granted and gave Lorenz an opportunity to amend her counterclaims. After Lorenz

replies that a quitclaim deed was not executed and recorded until 2002, after the fire.

**2.** Maddox testified that Thomas Walker operated the excavator. Thomas Walker denied Maddox's assertion. Wilbur Thomas Jr. testified that he was the sole operator of the excavator. The jury, in its special verdict, found Wilbur Thomas Jr. liable and it found that Thomas Walker was not responsible for the nuisance that harmed Maddox.

**3.** The complaint also named Thomas Development, Inc., Thomas Walker (Dorene Lorenz's stepfather), and Marty Lorenz (Dorene's father) as defendants. Maddox dismissed Marty Lorenz prior to trial. It is unclear when Thomas Development, Inc., was dismissed. The jury found that Thomas Walker was not responsible for the nuisance that harmed Maddox.

**4.** Lorenz is represented by counsel on this appeal.

filed amended counterclaims, Maddox again moved to dismiss them. Lorenz made no response and the judge dismissed Lorenz's counterclaims without further explanation. Lorenz appeals this dismissal, arguing that the judge failed to treat her pro se pleadings charitably and failed to provide her with a minimum level of information so that she could properly correct her counterclaims. She also argues that her counterclaims stated proper claims.

Trial was in Seward on November 15–17, 2005. The jury returned a verdict in favor of Maddox, finding Lorenz and Thomas liable in nuisance.[5] The jury allocated fault as follows: Lorenz—sixty percent; Thomas—forty percent; Hardy—zero percent. The jury further found that Maddox did not fail to mitigate his damages. In total, the jury awarded Maddox $21,000 for lost earnings, $72,000 for lost property value, and $2,000 for mitigation expenses. The superior court allocated these damages according to the degree of fault found by the jury. The jury also assessed punitive damages against Lorenz and Thomas in the amounts of $500 and $50,000, respectively.

At trial, the judge only instructed the jury on Maddox's nuisance claim. Maddox appeals the superior court's refusal to instruct the jury on his claim of strict liability based on AS 46.03.822.

After the verdict, Lorenz moved for a new trial. The court denied the motion. Lorenz repeats her arguments on appeal. Specifically, she appeals the jury's finding of causation and its award of damages. Thomas has not participated on appeal.

5. The jury also listed Hardy as a liable party, but did not allocate any fault to her.

6. *Petrolane Inc. v. Robles*, 154 P.3d 1014, 1018 (Alaska 2007).

7. The statute creates a private cause of action. *Fed. Deposit Ins. Corp. v. Laidlaw Transit, Inc.*, 21 P.3d 344, 356 (Alaska 2001).

8. AS 46.03.822(a).

9. AS 46.03.822(a)(1).

## IV. DISCUSSION

### A. Statutory Strict Liability Did Not Apply to Hardy Because She Was Not the Owner of the Property.

Maddox challenges the superior court's refusal to impose joint and several strict liability on Hardy based on AS 46.03.822. We review questions of law and the trial court's application of the law to facts de novo.[6]

Alaska Statute 46.03.822 is an environmental statute providing joint and several strict liability for damages resulting from a release of a hazardous substance.[7] The statute applies when two elements are met. First, there must have been an "unpermitted release of a hazardous substance" that caused damages.[8] Second, the party being sued must own the hazardous substance at the time of the release.[9]

Maddox's argument rests solely on the statute, but the parties' briefs occasionally refer to common law strict liability. This reliance is misplaced. The elements of the statute are distinct from tort law's ultrahazardous activity analysis.[10] Moreover, the goal of Maddox's appeal is to "impos[e] joint and several strict liability on Penny Hardy for the full amount of the compensatory damages awarded by the jury below." Strict liability in tort, as modified by AS 09.17.080(d), only provides several liability. Because the jury allocated zero fault to Hardy, Maddox's legal theory cannot be based on common law strict liability.[11]

We assume arguendo that the fire released a hazardous substance within the meaning of AS 46.03.826(5). Accordingly we

10. *Compare* AS 46.03.822 (environmental statute), *with Parks Hiway Enters., LLC v. CEM Leasing, Inc.*, 995 P.2d 657, 665 (Alaska 2000) (common law).

11. Maddox does not argue that a common law strict liability finding could provide a way to allocate damages to Hardy. Such a reallocation is not allowed. AS 09.17.080(a); AS 09.17.900 (defining "fault" to include strict liability); *see also Borg-Warner Corp. v. Avco Corp.*, 850 P.2d 628, 633 (Alaska 1993).

only discuss the second element of the statute.

For the second element, Maddox invokes the portion of the statute that imposes liability on the owner of a hazardous substance at the time of its release.[12] Maddox argues that Hardy was the owner of the property at the time of the fire's release of lead-tainted ash. Hardy responds that she did not own the property at the time of the fire.[13] The trial court did not reach the issue of property ownership because the court erroneously applied the common law strict liability test and concluded that the fire was not ultrahazardous.

■ When applying AS 46.03.822 this court follows a title theory of ownership.[14] Accordingly, an owner of property is the person holding title.[15] The issue of property ownership turns on the August 8, 2001 bill of sale that Hardy delivered to Lorenz. Maddox did not object to the admission of this document at trial and on appeal the parties do not dispute the genuineness of this document. Maddox argues that the controlling fact is that Hardy and Lorenz did not execute and record a quitclaim deed until after the fire in 2002. Hardy responds that the pre-fire bill of sale transferred title.

Maddox first argues, citing the recording statute AS 40.17.090, that the 2002 (post-fire) quitclaim deed "should have been conclusive on this issue [of ownership]." Maddox is

wrong. The recording statute provides that properly acknowledged documents are "admissible as evidence of the conveyance without further proof"[16] and that properly acknowledged and recorded documents "create presumptions with respect to title."[17] His argument that the recorded chain of title creates a "conclusive" finding of ownership for the relevant time periods misconstrues the statute. Maddox's argument is also contrary to case law holding that the presumptions of a recorded deed can be overcome by clear and convincing evidence.[18] Here, the bill of sale provides clear and convincing evidence to overcome the presumption that title transferred on the date listed in the recorded deed.

■ Maddox next argues, relying on the recording act, that he was an innocent third party to the conveyance and, thus, that the transfer of title was not effective as to him until the deed was recorded. Maddox's recording argument finds some support in case language. For example, when upholding the validity of an unacknowledged deed, we have added the qualification that the unacknowledged deed is only valid "as between the parties."[19] But Hardy's interpretation of the recording act is superior. Even if a deed is not recorded, title transfers upon execution of a bill of sale.[20] Thus, ownership for the purposes of AS 46.03.822 transfers upon execution of a bill of sale.[21] Important-

---

**12.** AS 46.03.822(a)(1).

**13.** Both parties implicitly assume that the property owner also owned the hazardous substance at the time of the release.

**14.** *Parks Hiway Enters.*, 995 P.2d at 661.

**15.** *Id.*

**16.** AS 40.17.090(a).

**17.** AS 40.17.090(b).

**18.** *See Rausch v. Devine*, 80 P.3d 733, 738–39 (Alaska 2003). As explained below, title transfers on the execution of a bill of sale even if the sale is not recorded. Because the purposes of the recording act are not implicated in this case, the presumptions of the act do not conclusively control.

**19.** *Smalley v. Juneau Clinic Bldg. Corp.*, 493 P.2d 1296, 1301 (Alaska 1972).

**20.** 14 Richard R. Powell, Powell on Real Property § 82.01[3], at 82–13 (Michael Allan Wolf ed., rev.2005). Even if one characterizes the bill of sale as a contract for sale, equitable title transfers upon the execution of the contract. *Id.* § 81.03[1], at 81–82 to –83. "[A] person is an 'owner' of property although he or she holds only the equitable title." 63C Am.Jur. 2d *Property* § 26 (1997) (citation omitted).

**21.** Lacking equitable title and possessing almost no other indicia of ownership, we conclude that Hardy cannot be held liable under AS 46.03.822. *See United States v. Newmont USA, Ltd.*, 504 F.Supp.2d 1050, 1061 (E.D.Wash.2007) ("In instances where a party is deemed to hold 'bare legal title,' courts ... have looked for 'other indicia of ownership' to determine owner liability under CERCLA."); *cf. Casperson v. Meech*, 583 P.2d 218, 222 (Alaska 1978) (noting that beneficial ownership transfers upon execution of a bill of sale and holding that the owner of legal title was "relieved of his obligation" to assure a les-

ly, the policy behind the recording act is not at issue in this case. The recording act is meant to protect a subsequent purchaser's reliance on a seller's title by providing a means for resolving competing claims to title.[22] Maddox was not a purchaser of property. He never relied on ownership records. The events at issue would have occurred regardless of recording.

### B. The Superior Court Properly Denied Lorenz's Motion for a New Trial.

Lorenz moved for a new trial after the jury's verdict. The superior court denied the motion. On appeal Lorenz challenges the jury's finding of causation and its award of compensatory and punitive damages.

 The question of whether to grant or deny a motion for a new trial "rests in the sound discretion of the trial court."[23] In reviewing an order denying a new trial, this court views the evidence in the light most favorable to the non-moving party.[24] "[W]e will reject a jury's award of damages and order a new trial only when the evidence supporting the jury's conclusion is 'so completely lacking or slight and unconvincing as to make the verdict plainly unreasonable and unjust.'"[25]

### 1. Sufficient evidence supports the jury's finding of causation.

Lorenz argues that there was insufficient evidence to support the jury's finding that the fire was the source of the lead that contaminated Maddox's property. She makes two arguments. First, she argues that testing revealed that there was no contamination. Second, she argues that "no evidence was presented to actually demonstrate that the fire was the source of any lead particles found on Maddox's property."

 Construing the evidence in the light most favorable to Maddox, we find that the trial court did not abuse its discretion when it denied Lorenz's motion for a new trial. The jury's determination that Maddox's property was contaminated by lead is adequately supported by the evidence. The sample of ash that Maddox sent out for testing contained in excess of ten percent lead by weight. Initial testing by the Alaska Department of Health and Social Services caused the EPA to conclude that the ash on Maddox's property contained lead in levels exceeding state and federal environmental standards. Maddox's expert testified that many samples taken from Maddox's property contained lead in amounts exceeding state and federal standards. While Lorenz argues that later testing by the EPA found that lead was no longer present in levels exceeding the cleanup standards, Maddox's expert directly addressed this later testing and both disputed Lorenz's interpretation of the results and criticized the EPA for using improper testing procedures. Lorenz also argues that blood tests conducted on Maddox and the dogs on his property revealed no elevated levels of lead. But this argument does not address Maddox's argument that his property was contaminated. Maddox never claimed and received no damages for personal injury.

 Lorenz's second argument—that there was insufficient evidence linking the lead on Maddox's property to the fire—involves a similar inquiry. Many of the samples taken by Maddox and the environmental agencies were of ash. Lorenz does not argue that this ash came from a non-fire source. The state's environmental report suggested that the ash from the fire contained high levels of lead. The state's report also explained that the prevailing wind would have blown this ash in the direction of Maddox's property. Moreover the EPA found elevated levels of lead in soil samples taken from the burn site of each fire. Lorenz argues that

see's quiet enjoyment of the property upon the transfer of equitable title).

**22.** 14 POWELL, *supra* note 20, § 82.01[2][a], at 82–9, § 82.01[3], at 82–11 to –12.

**23.** *Kava v. Am. Honda Motor Co.*, 48 P.3d 1170, 1173 (Alaska 2002) (citation omitted); *accord*

*Hogg v. Raven Contractors, Inc.*, 134 P.3d 349, 352 (Alaska 2006).

**24.** *Kava*, 48 P.3d at 1173.

**25.** *Domke v. Alyeska Pipeline Serv. Co.*, 137 P.3d 295, 299 (Alaska 2006) (quoting *Pugliese v. Perdue*, 988 P.2d 577, 581 (Alaska 1999)).

Maddox's expert could not rule out other sources of the lead on Maddox's property (she does not suggest what those sources might be) and did not know if Seward's soil naturally contained elevated levels of lead. She also points out that no one conducted a forensic investigation to determine the source of the lead. But these arguments ignore the applicable burden of proof and standard of review and are insufficient to warrant a new trial.

### 2. Sufficient evidence supports the jury's award of compensatory damages.

Lorenz argues that there was insufficient evidence to support the jury's award of compensatory damages. She challenges the jury's award of lost earnings for Maddox's dog kennel business on mitigation of damages grounds and the lost property value determination on sufficiency of evidence grounds.

### a. Sufficient evidence supports the jury's finding that Maddox mitigated his damages.

■ Lorenz argues that Maddox's lost business earnings should be reduced because Maddox did not mitigate his damages. As a result of the fire Maddox closed his dog boarding business for two years, reopening it in January 2004. Lorenz argues that Maddox could have reopened his business less than four months after the fire. Maddox responds that he kept his business closed because the ADEC and EPA told him to leave his property alone so they could assess it and clean it up if it was contaminated.

■ A wronged party's damages award is reduced by that party's failure to mitigate.[26] The reasonableness of a party's mitigation is a question of fact.[27] The jury found that Maddox did not fail to mitigate his damages.

Because the jury's mitigation determination is supported by the evidence, we find that the trial court did not abuse its discre-

tion when denying Lorenz's motion for a new trial. Lorenz's expert testified that the cleanup procedures recommended by the agencies would take two days to implement. But Maddox testified that the ADEC and EPA told him to leave his property alone until they finished their assessments and any necessary cleanup. Given that the EPA was conducting on-site assessments in June 2002, potentially conducted additional assessments after June, and issued its final preliminary assessment report in January 2004, there is evidence that the agencies were conducting an investigation during the two years that Maddox closed his business. The contamination that the agencies were investigating could have reasonably informed Maddox's decision to keep his dog boarding business closed.

### b. Sufficient evidence supports the jury's finding that Maddox's property is now worthless.

■ Lorenz challenges the jury's assessment of damages for lost property value. The jury awarded Maddox the fair market value of his property—$72,000. Lorenz argues that Maddox did not prove that his property was worthless. Maddox's primary evidence was from an appraiser's post-fire valuation of the property at $72,000. The appraiser worked under the assumption that the property was not contaminated. But the appraiser did state that he thought that if the property was contaminated it would be "worth nothing, and may be less." Lorenz contends that this was an unfair method of valuing the property because the appraiser in his appraisal did not treat Maddox's property as if it were contaminated and was hesitant to assume that it was. Maddox responds that there was sufficient evidence for the jury to determine that the property was contaminated and that, given this contamination, the jury could have found that the property was worth nothing.

The jury could have reasonably found that

---

**26.** *See Gates v. City of Tenakee Springs,* 822 P.2d 455, 460 (Alaska 1991) (quoting *Univ. of Alaska v. Chauvin,* 521 P.2d 1234, 1239 (Alaska 1974)).

**27.** *Id.*

Maddox's property is now contaminated.[28] The testimony of Maddox's appraiser suggests that the property would be worthless if it was contaminated. The jury is entitled to combine evidence from multiple sources to reach its determination. Nothing in the record suggests that it was unfair for Maddox to establish the lost value of his property in this manner.

Lorenz also argues that Maddox failed to properly establish the value of his property.[29] Maddox testified that his property was worth $72,000 before the fire. Lorenz did not object to this testimony at trial. Maddox and the appraiser provided testimony suggesting the value of Maddox's property after the fire. Alaska allows lay testimony from the owner of property as to the value of the property before and after a damaging event.[30] Maddox has provided enough evidence for this court to determine that the jury's damages award was not so unreasonable and unjust as to require a new trial.

### 3. Sufficient evidence supports the award of punitive damages.

Lorenz argues that her behavior was not egregious enough to trigger the jury's assessment of $500 in punitive damages against her. She notes that the jury found that her actions were not motivated by financial gain and that she did not know of the adverse consequences of the fire.

Alaska Statute 09.17.020 governs awards of punitive damages. The statute provides that the plaintiff must establish "by clear and convincing evidence that the defendant's conduct (1) was outrageous, including

acts done with malice or bad motives; or (2) evidenced reckless indifference to the interest of another person." [31] A showing of malice is not required. It is sufficient to show that "the defendant's conduct 'amounted to reckless indifference to the rights of others, and conscious action in deliberate disregard of [those rights].' " [32] We will reverse a punitive damages award only "if consideration of the record as a whole leaves us with a firm conviction of error and the need to intervene to prevent a miscarriage of justice." [33]

The jury reasonably could have determined that Lorenz acted with reckless indifference to Maddox's interests.[34] Maddox testified at trial that Lorenz mocked him for raising concerns before she started the first fire. Maddox further testified that the two fires were sizable, that the wind was blowing in the direction of his property, that the fires consumed objects containing lead, that the fires deposited a great deal of ash, and that explosions within the fires threw pieces of metal onto his property. The jury reasonably could have credited Maddox's testimony. Lorenz's arguments are insufficient to upset the jury's determination.

### C. The Superior Court Erred when It Awarded Prejudgment Interest on Maddox's Punitive Damages Against Lorenz.

The superior court awarded Maddox prejudgment interest on the jury's award of punitive damages of $500 against Lorenz. Lorenz argues that this award violates the prohibition on prejudgment interest for punitive awards set forth in AS 09.30.070(c). Maddox, correctly, conceded the point.

---

28. *See supra* Part IV.B.1.

29. Lorenz also claims error because Maddox's appraisal took place three years after the fire. Lorenz does not suggest that the property's value changed over the three years and shows no prejudice from this delay.

30. *Osborne v. Hurst,* 947 P.2d 1356, 1361 (Alaska 1997).

31. AS 09.17.020(b).

32. *Chizmar v. Mackie,* 896 P.2d 196, 210 (Alaska 1995) (quoting *State v. Haley,* 687 P.2d 305, 320 (Alaska 1984)).

33. *Wal–Mart, Inc. v. Stewart,* 990 P.2d 626, 638 (Alaska 1999) (quoting *Johnson & Higgins of Alaska, Inc. v. Blomfield,* 907 P.2d 1371, 1376 (Alaska 1995)).

34. AS 09.17.020(b)(2). Lorenz confuses the jury's finding that she did not know the adverse results of the fire beforehand by suggesting that this finding would prevent the jury from determining that she acted with reckless indifference. However, "knowledge" of a result is a higher state of mental culpability than "reckless indifference." *Cf.* AS 11.81.610(c) (criminal statute).

### D. The Superior Court Erred in Part in Its Dismissal of Lorenz's Counterclaims.

After Lorenz filed an amended statement of her counterclaims, Maddox moved to strike all of Lorenz's counterclaims. In response, the superior court issued a notice of intent to dismiss counterclaims in which the court suggested that Lorenz failed to state any claim on which relief may be granted and provided Lorenz twenty days to amend her counterclaims. After Lorenz filed an amended pleading, Maddox again moved for dismissal on Civil Rule 12(b)(6) grounds. Lorenz did not file an opposition to this motion. The superior court granted Maddox's motion to dismiss all of Lorenz's counterclaims without further explanation.

Lorenz makes two challenges. First, she argues that the superior court erred by not treating her pro se pleadings charitably and by not providing her sufficient information so that she could properly amend her counterclaims. Second, she argues that the superior court erred in its denial of her counterclaims because each counterclaim sufficiently stated a claim for relief.

Because we independently review and charitably construe Lorenz's counterclaims, we do not address Lorenz's first argument. We treat Lorenz's final pro se pleading of counterclaims as an opposition to Maddox's Rule 12(b)(6) motion. Accordingly we reject Maddox's argument that Lorenz defaulted by failing to respond to his final Rule 12(b)(6) motion.[35]

We review the superior court's dismissal of Lorenz's counterclaims for failure to state a claim upon which relief can be granted de novo, "presum[ing] all factual allegations of the complaint to be true and [making] all reasonable inferences . . . in favor of the nonmoving party."[36]

### 1. The superior court erred when it dismissed Lorenz's defamation counterclaims.

Lorenz's first and second counterclaims were for defamation. Lorenz alleged that Maddox made false statements to the government, the press, and local citizens about issues related to the lawsuit and her cleanup efforts. She alleged that Maddox's words placed an "unfortunate shadow" on her vocation as an interior designer and her role as one of Seward's Historical Preservation Commissioners.

In his motion for dismissal, Maddox argued that Lorenz's pleadings did not set forth the allegedly false statements and that Lorenz failed to properly allege damages. On appeal Lorenz argues that a complete reading of her complaint provided sufficient information about Maddox's statements. She also argues that she adequately alleged damages by claiming harm to her standing in the community. In response, Maddox contends that Lorenz never set forth the allegedly defamatory statements, made no claim that the statements were false, and inadequately pled damages.

The elements of defamation are: "(1) a false and defamatory statement; (2) an unprivileged publication to a third party; (3) fault amounting at least to negligence on the part of the publisher; and (4) the existence of either 'per se' actionability or special harm."[37]

A charitable reading of Lorenz's pro se counterclaim leads us to conclude that Lorenz included sufficient allegations of the statements that Maddox made. Lorenz alleged that Maddox wrote disparaging letters to the editor in the Seward Phoenix Log, that Maddox sought news coverage of the effects of the burn, that Maddox contacted state and federal agencies alleging illegal activities in connection with Lorenz's fire, and that Maddox distributed flyers disparaging Lorenz's

---

**35.** We note that the trial court's ultimate dismissal was on Rule 12(b)(6) grounds and was not based on failure to file a responsive pleading.

**36.** *J & S Servs., Inc. v. Tomter*, 139 P.3d 544, 547 (Alaska 2006) (quoting *Kollodge v. State*, 757 P.2d 1024, 1026 (Alaska 1988)).

**37.** *MacDonald v. Riggs*, 166 P.3d 12, 15 (Alaska 2007) (quoting *French v. Jadon, Inc.*, 911 P.2d 20, 32 (Alaska 1996) and citing RESTATEMENT (SECOND) OF TORTS § 558 (1977)).

cleanup activities. While these allegations did little to suggest the substance of Maddox's statements, they generally put Maddox on notice of Lorenz's claims.

Lorenz's complaint sufficiently alleged that the statements Maddox made were false by making the general assertion that Maddox made "wholly and in-part false statements." While the lack of specific statements in her pleadings makes this falsity allegation broad, this assertion was sufficient to put Maddox on notice of Lorenz's position.

Lorenz's complaint insufficiently alleged damages for some of her potential defamation claims. Lorenz's complaint could be read to state causes of action in libel and slander per se. These claims do not require an allegation of special damages.[38] However, to the extent that Lorenz attempted to recover for slander requiring proof of special damages (slander per quod), she failed to plead damages with any specificity.[39] But this failure might be attributable to insufficient guidance from the trial court.

On remand, Lorenz should replead all of her defamation claims. The trial court can then consider a renewed Rule 12(b)(6) motion or a motion for a more definite statement under Rule 12(e). Maddox can also utilize discovery to distill Lorenz's claim and may choose to file a motion for summary judgment. We note that some of Maddox's statements may be privileged. For example, Maddox's communications with state and federal officials alleging illegal activities likely warranted a qualified privilege and, if so, the only question would be whether the privilege was abused.[40] We further note that the jury's special verdict in favor of Maddox might provide him with a defense of truth as

to most of Lorenz's defamation claims. But we take no conclusive position on the validity of Lorenz's claims as they relate to Maddox's ability to assert privileges or other defenses.

## 2. The superior court erred when it dismissed Lorenz's claims for the intentional infliction of emotional distress.

■ Lorenz's third, fourth, sixth, seventh, and eighth claims for relief involved the intentional infliction of emotional distress (IIED). Maddox argued that Lorenz failed to allege extreme or outrageous conduct and that she made insufficient and improper allegations of damages. On appeal, Lorenz groups her claims together into a more general argument of IIED.

■ Lorenz's pleadings can be read to state a cause of action for IIED. An action for IIED lies where: "(1) the conduct is extreme and outrageous, (2) the conduct is intentional or reckless, (3) the conduct causes emotional distress, and (4) the distress is severe."[41] Lorenz claimed at least one instance of arguably outrageous conduct: Maddox allegedly stated that "the next time he caught [Lorenz] alone he would shoot her." However, some of Lorenz's other allegations do not appear to amount to outrageous conduct for the purposes of IIED. For example, she alleged that Maddox verbally harassed and taunted her and her daughter.[42]

Lorenz sufficiently alleged that Maddox's conduct was intentional and that it caused her emotional distress. Lorenz's allegations suggested that the distress was severe, resulting in anxiety, depression, and migraine headaches.

---

**38.** RESTATEMENT (SECOND) OF TORTS §§ 568(1), 569 (libel); *id.* §§ 570(c), 573 (slander per se) (1977).

**39.** *See* Alaska R. Civ. P. 9(h).

**40.** *See, e.g., Fairbanks Publ'g Co. v. Francisco,* 390 P.2d 784, 793 (Alaska 1964); RESTATEMENT (SECOND) OF TORTS § 598 & cmt. e (conditional privilege for communications to public officials concerning matters that affect the discharge of their duties).

**41.** *McGrew v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.,* 106 P.3d 319, 324 (Alaska 2005) (quoting *Lincoln v. Interior Reg'l*

*Hous. Auth.,* 30 P.3d 582, 589 (Alaska 2001)). Alaska has adopted the definition of outrageous behavior found in Restatement (Second) of Torts § 46 cmt. d (1965). *Lybrand v. Trask,* 31 P.3d 801, 803 n. 4 (Alaska 2001).

**42.** The Restatement (Second) of Torts § 46 cmt. d explains that "[t]he liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good filing down...."

On remand, Lorenz should replead all of her IIED claims.[43] Maddox will have the same options as outlined above concerning Lorenz's defamation claims. We make no comment on collateral estoppel or mootness that might result from our decision in this appeal.

### 3. The superior court erred when it dismissed Lorenz's claim for battery.

Lorenz's fifth claim for relief was for battery. Maddox, basing his response on Lorenz's three-paragraph claim for relief, moved for dismissal because the paragraphs did not state a cause of action. On appeal, Lorenz argues that an earlier paragraph in her answer alleged that Maddox threw a five-gallon bucket of dirty water on her.

Battery occurs when an actor intends to cause harmful or offensive contact with another and an offensive contact results.[44] Lorenz's allegation that Maddox threw a bucket of water on her would constitute an intentional, offensive touching. Accordingly the superior court erred in dismissing this counterclaim.

### 4. The superior court erred when it dismissed Lorenz's nuisance claims.

Lorenz's ninth and tenth counterclaims alleged that Maddox operated a dog boarding business and a drug business from his property and that both of these activities constituted a nuisance.

A nuisance is a "substantial and unreasonable interference with the use or enjoyment of real property."[45] Lorenz correctly argues that Maddox's briefing never suggests why her nuisance claims should fail on Rule 12(b)(6) grounds. A kennel of barking dogs can constitute a nuisance.[46] Maddox's alleged marijuana business might constitute a private nuisance.[47]

Maddox argued in his motion to dismiss that the counterclaims were not part of the same transaction or occurrence as his claims. But Maddox based his entire motion on Rule 12(b)(6). As is the case with Lorenz's other permissive counterclaims, the superior court erred when it failed to accept Lorenz's permissive nuisance counterclaim in accordance with Civil Rule 13(b).

## V. CONCLUSION

For the reasons stated, we conclude that the superior court correctly denied a strict liability instruction with respect to Maddox's claim against Hardy; correctly refused to grant Lorenz's motion for a new trial; and correctly dismissed what Lorenz now argues is a negligent infliction of emotional distress claim. But it was error to award prejudgment interest on Maddox's punitive damage award and to dismiss Lorenz's defamation, intentional infliction of emotional distress, battery, and nuisance claims. Accordingly the final judgment entered by the court is AFFIRMED in part and VACATED in part and this case is REMANDED for further proceedings in accordance with this opinion.

---

43. Lorenz, in her brief, suggests that she stated a claim for negligent infliction of emotional distress (NIED) and this claim was erroneously dismissed. But none of Lorenz's emotional distress claims used the word negligent. Instead, they consistently alleged intentional or knowing actions by Maddox. We therefore conclude that Lorenz did not allege counterclaims for negligent infliction of emotional distress and the court's general dismissal of her counterclaims was not in error with respect to the NIED tort.

44. RESTATEMENT (SECOND) OF TORTS § 18 (1965).

45. AS 09.45.255.

46. See, e.g., Van Deusen v. Seavey, 53 P.3d 596, 599 (Alaska 2002).

47. Regardless of the type of business involved, noise and traffic associated with a business could be actionable as a nuisance. See, e.g., Wade v. Fuller, 12 Utah 2d 299, 365 P.2d 802, 804 (1961). A nuisance requires more than the mere consumption of drugs on the premises. See, e.g., Davis v. State, 100 Md.App. 369, 641 A.2d 941, 951 (1994).